571 So.2d 726 (1990)
Morris ELLISON, Plaintiff-Appellant,
v.
VALLEY FORGE INSURANCE COMPANY and Don Bailey, Defendants-Appellees.
No. 21,961-CA.
Court of Appeal of Louisiana, Second Circuit.
December 5, 1990.
Rehearing Denied January 17, 1991.
*727 Jack H. Kaplan, Shreveport, for appellant.
Hicks & Hubley by S. Maurice Hicks, Jr., Edwin L. Blewer, III, Shreveport, for appellee, Valley Forge Ins. Co.
Mayer, Smith & Roberts by Alex F. Smith, Jr., Kim Purdy, Shreveport, for appellee, Don Bailey.
Before SEXTON, NORRIS and HIGHTOWER, JJ.
SEXTON, Judge.
Plaintiff appeals the district court judgment in this personal injury lawsuit finding defendant liable for plaintiff's personal injuries, reducing plaintiff's recovery because of his contribution to the incident in question, and finding no insurance coverage due to an intentional acts policy exclusion. We affirm.
The series of events leading up to plaintiff's injury began during the afternoon prior to and continuing into the early morning hours of April 3, 1981. Although there are some discrepancies between the version of events testified to by the plaintiff and by the defendant, they are largely in substantial agreement. The following consists of the undisputed facts unless otherwise indicated.
On the afternoon of April 2, 1981, defendant, Don Bailey, met plaintiff, Morris Ellison, at a pet shop which Ellison owned and managed on Mansfield Road in Shreveport, Louisiana. Ellison testified that Bailey came by the shop because he frequently did so, but Bailey testified that his visit to the pet shop that day was to assist Ellison in shutting down the business. Although it had been in operation for several months, it was apparently foundering, and steps were being taken to minimize Ellison's pecuniary losses.
After leaving the pet shop, Ellison and Bailey prepared to meet two other male companions for an evening of dining and drinking. Ellison testified that he went to Bailey's house to shower and dress, though Bailey testified that they went each to their respective homes.[1]
*728 The four men met at Bailey's home and from there went to dine at the "Mississippi River Company" in Shreve Square in downtown Shreveport. At the restaurant, the four had drinks and dinner. Following dinner, the four then went to "Monty's My Way" on Marshall Street in Shreveport, which testimony in the record indicates was a drinking establishment catering to homosexualsa "gay bar" in common parlance.
While at the bar, Bailey became quite ill, either from the excessive consumption of alcohol or from a dinner which did not agree with him. Regardless of the source of his nausea and its resulting physical manifestations, Ellison escorted Bailey to the outside of the bar, where he requested that Bailey turn over his wallet and ring for safekeeping while Ellison reentered the bar to seek out their two companions.[2] The four then returned to Bailey's home, where Ellison and Bailey were dropped off and the two companions then went on their way.
At this point, Ellison decided that he wished to leave Bailey's home to go out for more nightlife. Bailey wanted Ellison to stay home with him. Ellison, however, did leave and Bailey, upon realizing that Ellison was still in possession of his wallet and ring, pursued Ellison in his pickup truck. Before leaving in pursuit, however, Bailey telephoned Ellison's father to relate that Ellison was in possession of his wallet and ring and to request that he secure them should Ellison return to his parents' home before Bailey could locate him. Ellison's father requested that Bailey not call the police to prevent local police involvement, especially in light of Ellison's frequent contacts with law enforcement in the past.
Bailey found Ellison near the intersection of Jordan Street and Fairfield Avenue, and the two drove into the parking lot of a business establishment on Southern Avenue where they exchanged words before Ellison hurled Bailey's possessions at him. Ellison's testimony indicated that Bailey was upset that he had elected to go out again rather than stay home with him because Bailey was jealous of Ellison's relationship with anyone else. Bailey, however, testified that he was upset because Ellison was in possession of his wallet and ring and had refused to return them despite that the wallet contained a substantial amount of money, part of which Ellison had repaid to Bailey earlier in the day.
Bailey then returned to his home and was in the process of securing the home for the evening when Ellison returned and began to pound and kick at the front door, shouting and insisting that Bailey let him into the house. Bailey refused to grant Ellison access, but called Ellison's father to report that Ellison was causing a disturbance and was refusing to leave. While Bailey had Ellison's father on the telephone, he finally granted Ellison permission to enter the house for the purpose of speaking with his father and brother in order that they might attempt to convince Ellison to leave Bailey's home. Ellison refused to leave, however, insisting that he be permitted to retrieve all of his personal possessions prior to his departure. Bailey's testimony indicated that Ellison had only a small number of personal possessions there at the house, though Ellison testified that he had clothing and hygiene products, as well as some artwork and plants.
After Ellison entered the house and began to speak to his father and brother on the telephone, Bailey joined the telephone conversation on an extension, and the conversation quickly turned into a shouting match.
Ellison testified that he was on the telephone in the kitchen and that Bailey was on *729 the extension in the bedroom, some 40 to 50 feet down a main hallway, though the two could see each other. Ellison testified that Bailey came down the hallway toward him and began shouting at him in the kitchen to the extent that Ellison was incapable of maintaining the conversation with his family members. He therefore went down the hall to the bedroom where he intended to continue to speak with his family members on the extension which Bailey had just left. His testimony was that Bailey followed him down the hallway and was approaching the bedroom when Ellison intended to slam the bedroom door on Bailey. It was at that point that Bailey shot Ellison in the abdomen.
Bailey's version of the events differs substantially from that of Ellison. Bailey testified that Ellison was on the telephone in the kitchen while he was on the extension in the bedroom. While the two were on their respective telephone extensions, Bailey began brandishing a .22 caliber handgun in an attempt to show Ellison that he was quite serious in his insistence that Ellison leave his home immediately. When Ellison put down the telephone in the kitchen and started down the hallway toward Bailey's bedroom, Bailey testified that he put the gun away as he did not intend to use it, only that he had intended to make a "show of force." As Ellison entered the bedroom, Bailey's testimony was that Ellison pushed Bailey down to the floor. Ellison then told Bailey that he had better get the gun and use it because if he didn't, he (Ellison) intended to. At that point, Bailey retrieved the gun from beneath the bed and, as Ellison rushed at him with his hands extended as though to throttle Bailey, Bailey shot Ellison in the abdomen from approximately two feet away.
Bailey then picked up the phone, told Ellison's brother that he had just shot Ellison, and requested that the police and ambulance be contacted. Bailey then got a wet washcloth and attempted to comfort Ellison as much as possible until the arrival of the ambulance and the police. The ambulance and police arrived within minutes. The ambulance transported Ellison to the LSU Medical Center where he underwent emergency surgery to repair substantial damage to his abdomen. Bailey was arrested by the Shreveport police and charged with aggravated battery. He thereafter pled guilty to discharge of a firearm within city limits.
Ellison remained hospitalized for eight days and underwent a series of operations, as well as receiving a number of pints of blood. Following his discharge from the hospital, he recuperated at his parents' home, and the record seems to indicate that he recovered in due course.
Ellison brought suit against Bailey and his homeowner liability insurance company, Valley Forge Insurance Company (Valley Forge). Prior to trial, Valley Forge filed a motion for summary judgment, seeking to be dismissed from the lawsuit on the grounds that the insurance policy providing coverage to Bailey excluded coverage for intentional acts. However, the district court denied the motion, finding that there were still substantial issues of material fact which necessarily needed to be resolved at trial on the merits.
Following a two-day trial and after taking the matter under advisement, the district court rendered judgment in favor of the plaintiff, finding Bailey liable for Ellison's personal injuries. However, the district court found that Ellison's actions were such that he had contributed to the incident resulting in his injury and reduced his recovery by 30 percent. In addition, the district court awarded plaintiff $60,000 in general damages and some $5,500 in past medical expenses, but found that the evidence failed to support Ellison's claim for lost wages or impairment of earning capacity, as well as any element of future medical expenses. Finally, the district court found that the intentional act exclusion in Valley Forge's policy applied and denied all claims against it.
Ellison's father (hereinafter referred to as Dr. Ellison),[3] as provisional administrator of his son's succession, has been substituted *730 as plaintiff in this matter. Prior to the rendition of judgment at the district court level, Ellison died as a result of complications from acquired immune deficiency syndrome (AIDS).
Dr. Ellison appealed, arguing that the district court abused its discretion in its calculation of quantum and its assessment of his contribution to the incident, if any. Additionally, he argues that the district court should have found that the policy exclusion did not apply under the facts and circumstances of the case.
Bailey also brought an appeal, arguing that Dr. Ellison's recovery should be reduced even further by comparative negligence and that his insurance policy exclusion should not apply under the circumstances of this case.
Valley Forge has filed an answer to the appeals, arguing that Dr. Ellison's recovery should be further diminished by Ellison's comparative negligence, and that the damages awarded by the district court were excessive. It also argues that the district court judgment should be affirmed insofar as it found that Valley Forge's policy exclusion applies under the facts of this case.

POLICY EXCLUSION
Initially, we consider the issue of whether insurance coverage for Ellison's injuries is excluded by Valley Forge's standard "intentional act" policy exclusion. The clause at issue reads as follows:

SECTION II

COVERAGES
COVERAGE EPERSONAL LIABILITY
This Company agrees to pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of bodily injury or property damage, to which this insurance applies, caused by an occurrence.
* * * * * *

EXCLUSIONS
This policy does not apply:
1. Under Coverage EPersonal Liability and Coverage FMedical Payments to Others:
* * * * * *
f. to bodily injury or property damage which is either expected or intended from the standpoint of the Insured.
Both Dr. Ellison and Bailey argue that the instant policy exclusions should not operate to exclude coverage under the circumstances of this case, arguing that Breland v. Schilling, 550 So.2d 609 (La.1989), correctly applied, indicates that coverage should apply under the facts and circumstances of the instant case.
In Breland, in the course of an old-timer's softball game, defendant was caught in a rundown between second and third bases. He raced toward third and slid headfirst, but was tagged out by the third baseman, the plaintiff. After the play, the plaintiff either dropped, tossed, or threw the softball in the direction of the defendant, striking the defendant on the chin. A verbal altercation ensued concluding with defendant punching plaintiff in the jaw.
Plaintiff's jaw was broken on both sides and had to be wired shut for 12 weeks. During that time, he was unable to eat solid foods and lost 30 pounds. He suffered from depression and retains scars from the injury on both sides of his face.
Following trial, the jury decided that defendant was liable for plaintiff's injury, but that he had not intended the extent of the injuries which resulted. The jury also found that plaintiff was negligent. Because the interrogatories submitted to the jury indicated that the jury concluded that the defendant did not intend the extent of the injuries which resulted to the plaintiff, the Louisiana Supreme Court held the policy exclusion did not apply, and defendant's insurance company was therefore liable to the plaintiff.
In the instant case, appellant argues that Breland requires that Valley Forge be held liable for Ellison's injuries, arguing that the evidence, properly interpreted, demonstrates *731 that Bailey did not intend the serious injuries which Ellison experienced.
The Breland court held that
when minor bodily injury is intended, and such results, the injury is barred from coverage. When serious bodily injury is intended, and such results, the injury is also barred from coverage. When a severe injury of a given sort is intended, and a severe injury of any sort occurs, then coverage is also barred. But when a minor injury is intended, and a substantially greater or more severe injury results, whether by chance, coincidence, accident, or whatever, coverage for the more severe injury is not barred. Whether a given resulting bodily injury was intended "from the standpoint of the insured" within these parameters is a question of fact. Such factual determinations are the particular province of the trier of fact....
Breland v. Schilling, surpa at 614 (emphasis ours).
In the instant case, the following colloquy occurred between counsel for Valley Forge and defendant Bailey:
Q You were approximately 2 to 3 feet away when you pulled the trigger?
A Yes, sir.
Q Did you not accidentally pull the trigger?
A No, sir.
Q You intended to pull the trigger?
A Yes, sir.
Q You had the gun pointed towards him?
A Yes, sir.
Q From a distance of two to three feet, you had the option of shooting him in the leg, in the abdomen, in the chest, the arm, or the head, didn't you?
A Yes, sir.
Q At a distance of some two to three feet, you purposely choose his abdomen as the target?
A I brieflyas I remember I thought of shooting him in the leg and I thought that would be stupid. If I missed, he would grab the gun and kill me.
Q You made a conscious choice to aim the gun at his abdomen?
A Yes, sir.
Q You knew at this moment you fired the pistol and you made your decision to shoot Mr. Ellison in the abdomen that he could die?
A That was not my intention. It was not to kill him. It was to stop him.
Other testimony by Bailey indicated that he had served in the United States Marine Corps and had received both infantry and medical training in the military.
It is clear from the record that Bailey made a conscious decision to shoot Ellison in the abdomen. It is difficult to imagine that any person, particularly a person with military training, could expect any result other than serious personal injury to occur from the intentional discharge of a firearm into another person's body.
We therefore agree with the district court that the defendant intended the injuries which the plaintiff received in contrast to the injuries which occurred in Breland v. Schilling, supra. See Menard v. Zeno, 558 So.2d 744 (La.App. 3d Cir.1990), writ denied, 561 So.2d 121 (La.1990). The ruling of the district court finding that the terms of the insurance policy at issue excluded coverage is affirmed.

COMPARATIVE FAULT
The next issue which we consider is that of Ellison's comparative fault. The district court found that Ellison's conduct contributed to the incident such that his recovery should be reduced by 30 percent. Dr. Ellison argues that the district court erred in assigning such a large portion of fault to his son. Both Bailey and Valley Forge argue that the district court should have attributed a larger percentage of fault to Ellison.
This court determined in Harris v. Pineset, 499 So.2d 499 (La.App. 2d Cir.1986), writs denied, 502 So.2d 114 and 502 So.2d 117 (La.1987), that a plaintiff's fault which contributes to the cause of his injuries can be equated to contributory negligence and that the damages to which the plaintiff is *732 entitled are subject to reduction under the principles of comparative negligence found in LSA-C.C. Art. 2323.[4]
In such a case, the principles of comparative fault should be applied following the guidelines of Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967 (La.1985). The Watson court stated in this regard:
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault of assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between fault/negligent conduct and the harm to the plaintiff are considerations in determing the relative fault of the parties.
Watson v. State Farm Fire and Casualty Insurance Co. at 974.
Applying these principles to the instant case, we find no clear error in the district court assessment of fault. Ellison either contemplated or must have been aware of the danger involved in physically and verbally provoking Bailey when Bailey was armed with a handgun or when a handgun was within easy reach. Although Ellison testified that he was unwilling to leave Bailey's home until he had retrieved his personal belongings, we find his purported motive in remaining on the premises unreasonable in light of all other circumstances. He was in Bailey's home after being asked to leave, he had been counseled to leave by his family, the two men were both angry and upset and had both been drinking the entire evening, they had only shortly before exchanged words over Ellison's leaving Bailey's house, either because Bailey wanted him to stay, or because Ellison left with Bailey's valuables, and Bailey had made the risks of staying obvious when he began to brandish the handgun.
Although we may have assigned a somewhat higher percentage of fault to Ellison, we are unable to say that the district court was manifestly erroneous in its assessment. Accordingly, we find no merit to the arguments of any party regarding this issue and affirm the trial court's allocation of fault.

QUANTUM
The district court found that Ellison failed to prove any damages as a result of lost wages or loss of earning capacity, or the need for future medical treatment caused by the accident. Accordingly, Ellison was awarded $60,000 for general damages, plus his medical expenses as special damages.
Dr. Ellison argues that the district court abused its discretion by making such a small award of damages and suggests that Ellison's contraction of AIDS, of which he eventually died, may have contributed to the unreasonably low award. Bailey argues that the damage award was excessive and that the district court failed to take into account Ellison's poor health when determining the general damage award for pain and suffering. Valley Forge argues that the record contains no evidence that Ellison experienced any sustained suffering and that whatever suffering he may have experienced resulted from having contracted AIDS and not as a result of the incident in question.
The standard for reviewing general damage awards to be followed by the appellate courts was set out in Reck v. Stevens, 373 So.2d 498 (La.1979), recently followed by this court in Nichols v. Stone Container *733 Corporation, 552 So.2d 688 (La.App. 2d Cir.1989), writ denied, 556 So.2d 1262 (La. 1990):
Thus, the initial inquiry must always be directed at whether the trier court's award for the particular injuries and their effects upon this particular injured person is, a clear abuse of the trier of fact's "much discretion," La.Civ.P. art. 1934(3) in the award of damages. It is only after articulated analysis of the facts discloses an abuse of discretion that the award may on appellate review, for articulated reason, be considered either excessive, or insufficient.
Reck v. Stevens, supra at 501 (citations omitted).
Ellison was shot at close range with a .22 caliber handgun, resulting in a severed iliac artery and five perforations of the small bowel. He was immediately hospitalized and underwent an exploratory laparotomy, a saphenous vein graft to the severed artery, repair of the small bowel perforations, and a fasciotomy to the left leg. He was hospitalized from April 3 to April 11 and incurred $5,575.22 in medical expenses. After being discharged by the hospital, Ellison lived with his parents while recovering. He was required to undergo therapy for partial loss of use of his left leg for approximately two months. In addition, he had permanent scars extending from his chest to his lower abdomen, on his left thigh, and on his left calf. The record discloses that Ellison recovered completely from his injuries and that, other than scarring, there would have been no permanent effects from the shooting.
After reviewing all of the evidence in this matter, we conclude that the district court did not abuse its discretion in its assessment of quantum. Although the injuries sustained by Ellison were undoubtedly serious and painful, he received immediate treatment and was discharged from the hospital in just over a week and recovered in due course. But for permanent scarring, he sustained no permanent injuries.
In support of our conclusion that there was no abuse of discretion in the district court's assessment of quantum, in accordance with Wactor v. Pickens Lumber Co., 505 So.2d 815, 819 (La.App. 2d Cir.1987), writ denied, 508 So.2d 827 (La.1987), we considered the following similar jurisprudence as a general guide: Harris v. Pineset, supra, ($165,000 in general damages: hospitalized 44 days, seven major operations, permanent scarring, adhesions in the abdomen, chronic pain, intestinal obstructions, nausea, diarrhea, and would suffer future complications); Tobin v. Williams, 396 So.2d 562 (La.App. 3rd Cir.1981) ($25,000 in general damages: brief hospitalization, surgery, much pain for a considerable length of time, and permanent and severe scarring in the groin); and Brown v. Smith, 344 So.2d 1109 (La.App. 3rd Cir. 1977) ($3,000 in general damages: painful stay in hospital, surgery to remove pellets from bladder and stomach, 12-inch scar from breastbone to abdomen, cannot strain or lift anything heavy).
Accordingly, we affirm the award of damages herein.
For the foregoing reasons, the judgment of the district court is affirmed at appellant's cost.
AFFIRMED.

APPLICATION FOR REHEARING
Before MARVIN, SEXTON, NORRIS, HIGHTOWER and VICTORY, JJ.
Rehearing denied.
NOTES
[1] Ellison and Bailey had been having a homosexual relationship for over two years, and the record reflects that Ellison spent the night at Bailey's home on a fairly consistent basis. However, Bailey testified that Ellison did not live with him and had only a small number of personal items at his house. He stated that Ellison essentially resided with his parents. In addition, there was at least one substantial period of time during which Ellison resided in Dallas while pursuing a modeling career.
[2] Although the testimony conflicted slightly, it appears that the drinking establishment was located in an area of the city in which criminal activity was not unknown and Bailey was more secure by not having possession of his wallet and jewelry while waiting outside the bar for the return of his companions.
[3] Ellison's father, Dr. A. Lane Ellison, is a retired Shreveport dentist.
[4] LSA-C.C. Art. 2323 provides:

When contributory negligence is applicable to a claim for damages, its effect shall be as follows: If a person suffers injury, death or loss as the result partly of his own negligence and partly as a result of fault of another person or persons, the claim for damages shall not thereby be defeated, but the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death or loss.