629 So.2d 1255 (1993)
Danny "Bo" CORLEY, Jr., Plaintiff-Appellee/Appellant.
v.
David H. DELANEY, C.H. Delaney and State Farm Fire and Casualty Company, Defendants-Appellants/Appellees.
No. 92-899.
Court of Appeal of Louisiana, Third Circuit.
December 15, 1993.
Rehearing Denied February 10, 1994.
*1256 Charles Gregory Gravel, Alexandria, Celia R. Cangelosi, Baton Rouge, for Danny "Bo" Corley, Jr.
Larry Alan Stewart, Alexandria, for David H. Delaney et al.
John Gutierrez McLure, Alexandria, for State Farm.
DeWitt T. Methvin Jr., Alexandria, unknown.
James Buckner Doyle, Lake Charles, DeWitt T. Methvin Jr., Alexandria, for C.H. Delaney.
Before DOMENGEAUX, C.J., and STOKER, DOUCET, SAUNDERS and WOODARD, JJ.
WOODARD, Judge.
On August 24, 1989, 19 year old Danny "Bo" Corley sustained a close range shotgun blast to the face that was accidentally inflicted by 19 year old David Delaney. Bo survived, but he suffered massive facial injuries and is now legally blind. He sued David; David's father, C.H. Delaney (on whose property the shooting occurred); and C.H.'s homeowner's insurer, State Farm Fire and Casualty Company. A jury awarded total damages of $1,425,500 and apportioned fault as follows: Bo40%; David50%; C.H. 10%. All parties have appealed.

FACTS
Bo and David had known each other for about one year before the shooting. Their relationship was described at trial as "hot and cold." On some occasions they were friendly; on others, they exchanged harsh words, usually about their girlfriends. David testified that Bo verbally abused him but that their differences never led to a fight or even to shoving. Bo admitted that he had threatened to "whip" David in the past.
On the night in question, David and Bo saw each other at a local bar, but they did not speak. Later, after leaving the bar, Bo became angry about David's involvement in an earlier altercation between their girlfriends. At 1:00 a.m. he telephoned C.H. Delaney's residence, where David lived, and asked to speak to David. C.H. answered the phone and then told his wife to see if David was in the house. David had just arrived as Mrs. Delaney began to look for him.
The contents of the telephone conversation between Bo and David were disputed at trial. *1257 Bo testified that he wanted to meet David at Camp Livingston, a neutral site, where they would "just get it out in the openeither we're going to be friends or we ain't." According to Bo, David replied that he was not leaving his house but that, "If you want me, you can come over here." David, however, denied suggesting that Bo come to his house. He testified that he specifically told Bo, "Do not come to my house." David's version of the conversation was corroborated by C.H., who was listening on an extension phone and overheard the entire conversation, and by his mother, who was in the same room as her son. Police Chief Spencer Williams offered testimony that corroborated Bo's version of the conversation. Chief Williams testified that shortly after the shooting David gave a recorded statement in which he stated he told Bo, "If you want me, you can come over here."
After this telephone conversation, David went upstairs to his room where he loaded his 12 gauge, double barrel, sawed off shotgun, which he had recently purchased. Downstairs, C.H. saw David with the gun and told him to put it down. David complied, placing the gun on a table in the foyer. C.H. then went to his bedroom to get dressed.
While C.H. was in his bedroom, David noticed two vehicles approach the Delaney residence. One stayed on the street at the end of the Delaney's long driveway; the other, with Bo as a passenger, drove toward the house. David re-armed himself with the shotgun and waited on the porch as the vehicle came up the driveway. He then walked through some bushes and appeared near the passenger side of the vehicle. With his finger on the trigger, David pointed the gun at the car and tapped it on the windshield, while saying something such as "Get out of the damn car, Danny." At that point, the gun discharged, with the shot blasting a hole in the windshield and striking Bo on the right side of his face.
Bo testified that he was shot before he made any movement to get out of the car. He had no recollection of the ten days immediately following the shooting. His injuries, more fully discussed below, include the loss of one eye, legal blindness in the remaining eye, the destruction of bone and facial tissue, and permanent disfigurement.

APPORTIONMENT OF FAULT

A. C.H.'s Liability
C.H. argues the jury should not have assessed any fault to him. He contends the injuries to Bo were unforeseeable because he could not have anticipated that David, an obedient and non-violent person, would have re-armed himself after he was told to put the gun down and complied. Bo would have us increase the percentage of C.H.'s fault, arguing that C.H. should have recognized the danger presented by David's weapon, particularly after C.H. had just overheard the unfriendly conversation between the two young men.
In Fontenot v. Bolfa, 549 So.2d 924 (La. App. 3d Cir.1989), this court summarized the duty a homeowner owes to those lawfully on his premises:
Under our jurisprudence, a homeowner is not an insurer of the safety of persons lawfully on their premises. Generally, the duty owed by the owner or occupier of a home to a social guest is to avoid reasonably foreseeable danger to the guest and to keep his premises safe from hidden dangers in the nature of traps or pitfalls. Lear v. United States Fire Insurance Co., 392 So.2d 786 (La.App. 3d Cir.1980). Furthermore, our Supreme Court has recognized that there is, generally, no duty to protect others from the criminal activities of third persons. Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364 (La.1984). Thus, the duty imposed by law on a homeowner does not extend to unanticipated or unforeseeable criminal acts of a third person. Broussard v. Peltier, 499 So.2d 1026 (La. App. 3d Cir.1986) Vertudazo v. Allstate Insurance Co., 542 So.2d 703 (La.App. 4th Cir.1989).
549 So.2d at 926.
In Fontenot, we declined to impose liability on the homeowner, where a gun was brought on the premises by a third party and the ensuing events happened so quickly that the homeowner could not have prevented the *1258 intentional shooting of her guest. In Vertudazo, the homeowner also was absolved from any responsibility when one guest, without the homeowner's knowledge, suddenly retrieved a weapon that was concealed on the premises and shot another guest.
In the recent decision of Brisco v. Fuller, 623 So.2d 196 (La.App. 2d Cir.1993), a major son who lived with his father retrieved his father's gun and brought it to the home of a third person, where he shot the victim. The court held that the parent had no duty to control or to warn against the criminal actions of a major child who is not mentally disabled. There is no duty to control or warn against the criminal actions of a third person so as to prevent him from causing physical injury to another, unless some special relationship exists to give rise to such a duty. Traditionally courts have found such relationships to exist between parent and child; employer and employee; carrier and passenger, etc. Haskins v. State Farm Fire and Casualty Company, 612 So.2d 990 (La. App. 3d Cir.1993). Brisco, supra, held that "parent and child" refers to the relationship between a parent and a minor child or a mentally disabled child for whom the parent may be responsible.
The court in Shaw v. Hopkins, 338 So.2d 961 (La.App. 4th Cir.1976), found there was no cause of action against parents of a major tortfeasor who injured the plaintiff. The court stated there is no authority under Louisiana law for holding parents liable for tortious actions of major children.
Thus, there is no legal authority for holding C.H. liable as David is a major child. Further, the danger to which Bo was exposed was not reasonably foreseeable by C.H. Accordingly, we reverse the trial court's assignment of ten percent of fault to C.H. and hold that he is without fault.

B. Liability of Bo and David
Bo and David have appealed the percentages of fault assigned to them, each contending that the other should be found substantially more responsible for this accident. Bo argues that he did not make any threatening movements or sounds that would have justified a response with potentially deadly force. David contends that Bo instigated this and the other confrontations between the two.
The jury obviously believed that the conduct of both young men contributed to the fateful outcome, with David bearing more of the blame because of his use of the firearm.
The actions of both young men were deliberate, as opposed to inadvertent, with nothing of significance to be gained. It is clear that Bo instigated the early morning confrontation with David. Bo was upset because David had encouraged their girlfriends to fight each other, but this incident was in the past and it was not mentioned on the night in question. It certainly did not justify a threatening phone call made to the Delaney residence at 1:00 a.m. Nor can Bo legitimately claim that he was "summoned" or "invited" by David, even if David did say, "If you want me, come over here." On the other hand, the circumstances do not justify David's introduction of a firearm into the controversy. David claimed he retrieved the weapon for protection, but we find no evidence of any real danger: only one vehicle approached the Delaney residence, and Bo and David had never fought before. David's use of the firearm was totally unwarranted and created a greater risk than any action of Bo's.
It is well settled that a resort to the use of a dangerous weapon to repeal an attack is not justified except in exceptional cases where the actor's fear of danger is not only genuine but is founded upon facts which would likely produce similar emotions in men of reasonable prudence. See Edwards v. Great American Ins. Co., 146 So.2d 260 (La. App. 2d Cir.1962). In the present case, there is no showing of any circumstances that would justify David Delaney's resort to the use of a dangerous weapon to repel an attack, as he knew that Bo was on his way to his father's home in which David had not only the assistance of his father but also a telephone with which he could call the police and a buzzer system which would have summoned the police. There was absolutely no need to resort to the use of a dangerous weapon to repel the attack, as, in fact, there *1259 would have been no attack if David had summoned help or simply stayed within his father's home. It is clear from the entire record that David was in no danger of attack from Bo at the time he armed himself and the circumstances in no way justified use of this weapon.
Accordingly, we reapportion the allocation of fault among Bo and David to be 20% and 80% respectively.

DAMAGES
The jury awarded $1,425,500.00 damages to Bo. On appeal, David argues that the general damage awards, which total $850,000.00, are an abuse of the jury's discretion.
Before a trial court award may be questioned as inadequate or excessive, the reviewing court must look first, not to prior awards, but to the individual circumstances of the present case. Only after analysis of the facts and circumstances peculiar to this case and this individual may a reviewing court determine that the award is excessive. Reck v. Stevens, 373 So.2d 498 (La.1979).
The shotgun blast inflicted massive injuries to the right side of Bo's face. Skin and muscle on the right cheek, lips and nose were blown away along with portions of the bones in the upper and lower jaws. Many teeth were missing and some remaining were badly damaged. Pellets perforated both eyes, resulting in a total loss of vision in the right eye and legal blindness in the left eye.
After his initial, life saving surgery, which lasted thirteen hours, Bo began a series of grueling reconstructive operations. Multiple skin and bone grafts were necessary to replace the missing tissue in his face and jaws. The upper and lower jaws had to be reconstructed, and dental appliances replaced the missing teeth. The right eye was removed and replaced with a glass prosthesis; complications in the left eye required multiple surgeries. The best vision that Bo can attain in his one remaining eye is only 20/200 and that is with the aid of a high powered contact lens. At the time of trial, Bo still faced several surgical procedures in the future. He had a loss of feeling in parts of his face, pain in his mouth and constant headaches from damage to his sinuses.
Before the shooting, Bo was very athletic, having lettered in most of the major high school sports. After graduating from high school, Bo began working to pay for a car, but he intended to go to college. In fact, he was accepted by a university and he hoped to walk-on in college athletics. Because of his vision problems, Bo can no longer participate in athletic events. He still attempts to shoot pool and play basketball, but his poor vision interferes. He can watch football on television, but he has to sit within two to three feet of the set. He was once very independent, but now he must rely totally on others for transportation.
Bo has undeniably suffered great physical pain. At age nineteen, he was forced to accept that any future which he may have envisioned was no longer attainable. His entire adult life will be spent legally blind and dependent on others. Under Reck, our first inquiry is whether this trier of fact abused its discretion in the award to this particular plaintiff. After reviewing the medical and lay testimony in the record, we do not find such an abuse of discretion.
David also argues that the trial court erred in admitting a life-sized close-up of Bo that was taken before his first surgery. David contends that the photograph was inflammatory and served no purpose but to move the jurors to sympathy for Bo. We disagree.
The photograph is certainly gruesome, and we question the need for its poster-size reproduction. However, we find that it does have some probative value. The photograph depicts the severity of Bo's injuries before any surgical intervention. See Bruce v. Rogers Oil Tool Services, Inc., 556 So.2d 922 (La.App. 3d Cir.1990), where we recognized that unpleasant photographs of disfiguring injuries can be relevant to the issue of emotional pain and suffering. Further, any sympathetic response which the photograph may have evoked would have been overcome by Bo's presence at trial where the jurors could observe his greatly improved condition. We find no error in the trial court's decision to admit this photograph.

*1260 APPORTIONMENT OF POLICY PROCEEDS
The issue concerning the amount of the judgments rendered against the insureds, C.H. and David, in excess of State Farm's policy limits is now moot due to our finding that C.H. has no liability. Thus the $300,000.00 in insurance proceeds will all be applied to David's liability to Bo.

DECREE
For the reasons assigned above, the judgment appealed is reversed in part and amended in part. Costs of this appeal are assessed to David H. Delaney, appellant/appellee.
REVERSED IN PART; AMENDED IN PART.
STOKER, J., concurs and assigns reasons.
DOMENGEAUX, C.J., dissents in part and assigns reasons.
SAUNDERS, J., dissents and assigns reasons.
STOKER, Judge, concurring.
I fully concur in the views expressed in the majority opinion. I add this concurrence to emphasize that, insofar as C.H. Delaney is concerned, this action in tort against him is leveled at alleged personal negligence on his part, rather than on vicarious liability, for the actions of his major son. The essence of the claim against C.H. Delaney is that he should have controlled his son, and, in failing to do so, he breached a duty owed to the plaintiff. No special relationship existed between C.H. Delaney and Danny "Bo" Corley, Jr. which established a duty owed by C.H. Delaney to Corley.
Whether a duty is owed is a question of law. Faucheaux v. Terrebonne Consol. Government, 615 So.2d 289, 292 (La.1993); Harris v. Pizza Hut of La., Inc., 455 So.2d 1364, 1371 (La.1984) and Haskins v. State Farm Fire & Cas. Co., 612 So.2d 990, 993 (La.App. 2d Cir.1993). The question of liability on the part of C.H. Delaney should not have been given to the jury in the first place. The finding by us of no duty owed by C.H. Delaney to the plaintiff does not run afoul of the manifest error rule.
A further point I wish to make is that in my opinion the case of Webb v. Smith, 555 So.2d 556 (La.App. 4th Cir.1989), relied upon by the plaintiff, was erroneously decided and I would decline to follow it.
DOMENGEAUX, Chief Judge, dissenting in part.
I fully agree with the majority on the question of quantum: the amount of the jury award was not manifestly erroneous in light of the massive injuries suffered by Bo. However, I must dissent from that portion of the opinion which totally disregards the jury's apportionment of fault of all parties.
I would rely on Webb v. Smith, 555 So.2d 556 (La.App. 4th Cir.1989) to affirm the finding that C.H., the homeowner, was 10% at fault. In Webb, the homeowner produced a pistol which was then taken from her by a guest, who in turn shot an unwelcome visitor in a scuffle. In Webb, the court held that the shooting victim had established a breach of duty by the homeowner, who was the owner and possessor of the gun and who was the person from whom the shooter obtained the weapon.
In the instant case, C.H. was not the owner of the weapon in question, but he allowed his son to possess it in the family home. An avid gun collector, C.H. knew that a sawed off shotgun was both extremely dangerous and illegal. Unlike the parties in the fast paced scenarios of Fontenot and Vertudazo, cited by the majority, C.H. had time to reflect upon the consequences of what he observed. He saw his son armed with a dangerous weapon. He had just overheard a conversation indicating that there was trouble between Bo and David. Regardless of which version of that conversation is accepted, its confrontational tone cannot be denied. C.H.'s decision to get dressed at such a late hour indicated that he anticipated Bo's arrival. Clearly, C.H. was the superior actor, considering his maturity and his knowledge of weapons. C.H.'s liability stems from his duty as a homeowner to protect those lawfully on his property, not from a duty to control his son. Unlike the facts of Brisco and *1261 Haskins, cited by the majority, the events leading up to this accident occurred on C.H.'s property, in his presence, while he still had the opportunity to intervene. Under these circumstances, I would find no error in the jury's conclusion that C.H.'s failure to intervene contributed minimally to this tragic accident.
I also would not disturb the jury's finding that Bo and David were nearly equally at fault in this accident. To support his claim that he is entitled to a reduction in the percentage of fault assessed to him, Bo, the victim, relies on Harris v. Pineset, 499 So.2d 499 (La.App. 2d Cir.1986), writs denied, 502 So.2d 114 and 502 So.2d 117 (La.1987) (where the shooting victim was found only 10% at fault). However, Harris involved a chance encounter between two strangers in a bar. In the instant case, Bo sought out David with the intention of provoking a confrontation over a seemingly insignificant matter. The cases cited by David are likewise distinguishable. The extreme verbal abuse and provocation in Jones v. Thomas, 557 So.2d 1015 (La.App. 4th Cir.1990) or in Ellison v. Valley Forge Insurance Company, 571 So.2d 726 (La.App. 2d Cir.1990), writ denied, 577 So.2d 14 (La.1991) are not present in this case. The instant situation can be summarized as follows: Bo was the antagonist, but David escalated the conflict when he armed himself with a dangerous, illegal weapon. The jury was in the best position to weigh the evidence, and its conclusions are reasonable and supported by the record. The jury's result is not manifestly erroneous.
Had the majority affirmed the percentages of fault assigned by the jury, we would have next determined the amount of the judgments to be rendered in excess of the insurance policy limits against C.H. and David. Although C.H., the named insured, and David, the omnibus insured, were both covered by the same policy, they were not solidary obligors for the entire excess because the plaintiff, Bo, was assessed a greater percentage of fault than C.H. See La.C.C. art. 2324.
After the verdict was rendered, the defendants, C.H., David and State Farm asked the court to enforce a "stipulation" between the three, whereby the first $142,550 of the $300,000 policy would be used to exhaust C.H.'s debt, with the remaining $154,450 to be credited to David's debt of $712,750. Bo, on the other hand, asked that the insurance proceeds be applied to the debts of C.H. and David respectively in proportion to the percentages of fault assessed to them. The court agreed with Bo and rendered judgment against C.H. and State Farm in solido for $50,000 and against David and State Farm in solido for $250,000. The court then rendered an excess judgment against C.H. for $92,550 and against David for $462,750. C.H. appealed the excess judgment rendered against him, arguing that the court should have applied the insurance proceeds in accordance with the wishes of the insureds.
With no jurisprudence on point, both sides cited by analogy those cases involving multiple claimants to an inadequate insurance fund. C.H. and State Farm relied on Holtzclaw v. Falco, Inc., 355 So.2d 1279 (La. 1978), which held that one claimant is not entitled to a pro rata share of an insurance fund in settlements. The Holtzclaw settlement occurred prior to judgment. Holtzclaw also reiterated the principle that in settling claims, the insurer's primary duty is to its insured. Bo relied upon several cases which have held that multiple claimants are entitled to a pro rata division of the policy limits upon the rendition of a judgment. See Johnson v. State of Louisiana, 450 So.2d 386 (La.App. 1st Cir.1984), writ denied, 450 So.2d 1311 (La.1984).
C.H. and State Farm argued that the court's judgment improperly dictated how the insurer was to perform its obligation to its insureds. If the instant case involved an extra judicial settlement as in Holtzclaw, this argument may have had some merit. However, as the above cases illustrate, once a claimant's rights have been judicially determined, it is within the trial court's power to order a specific distribution of the available insurance proceeds.
Bo was clearly entitled to a judgment in excess of the policy limits. In the absence of solidarity between David and C.H., the court had to fashion a method of crediting the insurance proceeds to the debts of the individual *1262 obligors. In so doing, the trial court relied upon well established principles that legal responsibility is determined by assigning percentages of fault (La.C.C. art. 2323) and that the purpose of all liability policies is to provide coverage to all insureds, whether named or omnibus (La.R.S. 22:655). I am unable to find error in the result reached by the trial court.
For these reasons, I would affirm the judgment of the trial court in its entirety.
SAUNDERS, Judge, dissenting.
It is well settled that a resort to the use of a dangerous weapon to repel an attack is not justified except in exceptional cases where the actor's fear of danger is not only genuine but is founded upon facts which would be likely to produce similar emotions in men of reasonable prudence. See Edwards v. Great American Ins. Co., 146 So.2d 260 (La.App. 2d Cir.1962). In the present case, there is no showing of any circumstances that would justify David Delaney's resort to the use of a dangerous weapon to repeal an attack as he knew that Bo Corley was on his way to his father's home in which David had not only the assistance of his father but also a telephone with which he could call the police and a buzzer system which would have summoned the police. There was absolutely no need to resort to the use of a lethal weapon to repeal the attack as, in fact, there could have been no attack if David Delaney had summoned help or simply stayed within his father's home. It is clear from the entire record that David Delaney was in no danger of attack from Bo Corley at the time he armed himself and the circumstances in no way justified use of this weapon.
In the case of Harris v. Pineset, 499 So.2d 499 (La.App. 2d Cir.1986), writs denied, 502 So.2d 114, 117 (La.1987), the plaintiff was found by the jury to be completely free of fault when the defendant, Pineset, introduced a gun into the fray after the two men had left a saloon confrontation to continue their discussion outside. The Second Circuit reversed this and held the plaintiff to be 10% at fault upon a specific finding that the plaintiff had observed the gun on the person of the defendant, panicked and grabbed the gun and these facts, as related by the plaintiff, required the court to conclude that plaintiff's conduct contributed to the physical encounter wherein the pistol in the hands of Pineset actually fired.
In the present case, there is no action on the part of Bo Corley which contributed to the physical encounter subsequent to his learning that the defendant had a gun. Corley's learning of this information and his being shot happened substantially simultaneously. Thus, there is no basis in the present case for a finding of even 10% fault on the part of plaintiff as was found in the Harris case. In the case before us, the gun was introduced by the defendant under circumstances which did not justify resort to the use of a dangerous weapon to repeal an attack. For this reason, I feel that no fault should be allocated to the plaintiff.
I also do not agree with the majority that there is no legal basis for holding C.H. Delaney responsible for the injuries to the plaintiff. David Delaney was a guest in his father's home. C.H. Delaney saw that his son was about to bring a lethal weapon into an emotionally charged disputea situation which cried out for intervention by the more calm and mature C.H. Delaney. C.H. Delaney did not fail to act, but his actions were minimal and under the facts of this case, the jury was justified in allocating 10% fault to C.H. Delaney.
For the foregoing reasons, I respectfully dissent.